So, Mr. Jones, whenever you're ready, y'all can have a seat. Thank you, your Honor. May it please the Court. So, just to refresh on the on the basic facts here, my client, Gerard Newsome, was injured at the defendant's or the appellee's premises by hydrogen sulfide, NASH, we're gonna call it a couple different things. I'm gonna refer to it as H2S throughout this hearing. So, he was exposed to H2S through a series of negligent events by the appellee. Immediately upon, well, he sees it, he smells it, and he collapses to the ground. And this is corroborated by the IP employees. He's immediately, or once he regains consciousness, he's, you know, flustered trying to get everything back together, he immediately calls his employer. His employer tells him, hey, if you can still do the job, do the job, and then we'll worry about getting you treatment afterward. And that's exactly what he did. IP sent a security employee that was an EMT to assess Mr. Newsome. He declined treatment, and he went into an urgent care, and that's where his treatment started for the injuries from this event. The threshold question that we have before this court is, does HAVNR apply? And it does not. It does not apply to this case. The number one thing about HAVNR is that it built an exception, not a rule. So, HAVNR says that you've got approved causation through epidemiological studies showing that there's at least a doubling of the increase of the risk, but that is when there's no direct proof of causation. And in our judgment, that threshold question is, is there direct proof? If so, we don't even look at HAVNR. And in this case, we absolutely have direct proof of causation. This is an immediate harm caused by immediate exposure. HAVNR makes sense. I mean, the Texas Supreme Court really did the plaintiffs who suffered things like the plaintiff in the HAVNR case a favor by building out, by carving out a way to still prove causation even though they lack that direct proof. And it gave them the recipe on how to do it. That's not this case. This case, we saw immediate harm, immediate injury. In HAVNR, there was a prolonged exposure where a mother was taking a medication and they alleged that that led to a baby's deformity. The problem with the causation is many mothers had taken that medication and no deformity existed with the baby when it was born. And secondly, that deformity appears in many babies who were never exposed to that drug. And so when HAVNR made sense, they said, hey, look, we can't prove, first off, we can't give the defendants a windfall in every single exposure case. We have to have an avenue for plaintiffs to prove causation. And that's what HAVNR prescribes. In this case, we don't have any of that. We know that H2S is extremely dangerous in even tiny amounts. The defendant's own expert, IP's own expert, admitted that within a few breaths at just 500 to 700 parts per million, that can cause loss of consciousness, paralysis, and death within a few breaths. And he referred to it as it's like turning off the light switch. And when we talked to the IP employees, and we have the testimony from them saying that that's almost exactly what happened. I mean, it was a light switch, drop to the ground. The IP employee said it was very scary. It looked like he was having a seizure. And so this is not a HAVNR case. He immediately, within days, was complaining of back and neck pain from falling, collapsing to the ground. A 300-pound man just going down like that. We can expect that to happen, right? He was treated for a rash that was on his body that arose out of this. And that's something that their expert talks about, how it irritates the skin. That urgent care comp doctor prescribed, or diagnosed him with shingles for that, which is, I'm not sure how that happened. But Mr. Newsom's complaints have been consistent. And for some reason, the court failed to look at the facts in the best light of the plaintiff. And instead, it presumed that HAVNR applied right from the start, and that was . . . I mean, that led to every error which ultimately became their opinion in dismissing the case. So, the important . . . Is there a difference between something that can cause and something that does cause? Absolutely, Your Honor. And I think that's, you know, why HAVNR came to be. Because it was a, well, we don't know for sure if this is what caused this deformity. We need to know, you know, that there was a doubling of the risk and they prescribed that formula. But H2S is like cyanide. You know, there's no human that's going to be able to breathe in H2S and just be normal. They're going to drop unconscious and potentially die if it's at that level that's high enough. And so, there is no way for us to comply with the HAVNR standard on this case as well. First off, it would not make sense. It's illogical to do so, because we have direct proof of causation. But even if we try, HAVNR requires a known dose for a known duration. We have no idea and could not know how much he was exposed to in this acute exposure. If you look at the cases in the progeny of HAVNR, it's prolonged exposure. Like, prolonged exposure, it's oftentimes drugs or someone that works in a factory where we know that they're around us for, you know, 10, 15 years. And we know that they're being exposed to, you know, measurable amounts of this chemical. And then, later in life, they're diagnosed with cancer or something like that, that they then try to link to the exposure. So, HAVNR makes absolute sense in those situations. We're applying Texas law here, right? Yes, Your Honor. So, what's your best case under Texas law that's making this distinction? So, I could look to and say, oh, yeah, yeah, this is a situation where HAVNR does not apply. So, we've got two great cases, Johnson and Morgan. What was the second? So, Morgan is the Texas Supreme Court case. Johnson is a Fifth Circuit case, Your Honor. And in looking at those, so Morgan was a lady who worked with a typesetter and there was a chemical that was leaking out of the typesetter that they noticed about a month after she had been working on it. Once they discovered that error, they came in and fixed it. And she goes, oh, this must have been why I've been having headaches and difficulty breathing. And very similar irritation to the eyes, you know, very similar symptoms to what Mr. Newsom was experiencing. And so, the Morgan court said, the Texas Supreme Court said, hey, that gives the jury enough to rely on right there. That's a logical sequence of events in which a jury can rightfully infer that this was the cause of her  So, it was a leaking of a chemical and what health problems was she suing for? So, blurry eyes, headaches, and there was one more. It was blurry eyes, headaches, and some, oh, difficulty breathing. So, you're saying that's a good Texas Supreme Court case that establishes this proposition? Yes, Your Honor. Because that's even more attenuated than the case at hand. Like, the case at hand is like immediate dropping, right? And then he's complaining of headaches, back pain and neck pain within a couple days. I mean, these are all, there's a lot. So, I think with some of the confusion . . . You say Johnson, that's one of our cases? Yes, sir. So, Johnson is a case where a factory worker was being exposed to, I think it was called certain coat. It was some kind of chemical, and he was complaining and making, and tying his injuries to that. He had acute injuries. It was only a two-day exposure, so they knew how long. They knew how much. They could replicate it if they wanted to, but it was an acute exposure. He had acute injuries. He also had chronic injuries. And so, what the Fifth Circuit rightfully said in that case was, hey, look, he doesn't need any expert testimony at all on the acute stuff. His lay testimony is sufficient, just like they said in Morgan. Lay testimony is sufficient on those, but we're not going to let him go forward with the chronic injuries, where now it's like, well, they could be caused. All right. So, there's a distinction there between acute and chronic, you're pointing to. So, in your client, what injuries is he suing for? So, he is suing for the headaches that he suffered from that, the day of the injury. And we're going to shorten that time limit. We're not going to be a trial saying, hey, he's still suffering from these headaches today, because I could understand how that could be a problem, as far as, you know, we don't want to run afoul. We want to try a clean case, but that, and then the back of the neck, which was within a couple days, the skin irritations, the blurry vision, the eye irritations, all the things that he experienced over those next, at least over the next couple months. And even Johnson said, you know, this, the treatment that he got over the summer, where he visited the doctor several times over the summer, lay witness testimony is sufficient to prove causation for those injuries. So, looking two years out, you know, on ailments that arise then, of course, those are going to be too far attenuated, but these things that the jury can directly tie to that initial exposure are fair game for lay witness testimony. Now, that being said, we have 30 retained, I mean, 30 non-retained treating physicians who have, who filled out questionnaires about, you know, the treatment that they provided that had to be linked to this. And so, we have them, but we also retain three experts and designated these three experts timely who testified about, well, one, we had a liability expert who testified about liability, of course, and then the family care plan, I mean, the family, the life care plan, who looked at all of these questionnaires, who pulled those in, who relied on those, we had those as well. This isn't a case like in, you know, there's some cases where y'all looked at it and they've said, where they've missed deadline after deadline after deadline. This is not that case. We, as soon as this was even brought to our attention that they thought Havner applied, which I never even suspected, as soon as that was brought to our attention, we immediately brought somebody that could look on that, an expert, and he said there's no way you can recreate this. You can't do a model. You cannot do a dosing model because we don't know the dose and we don't know the duration. Those are two critical factors, and I think it's undisputed that you can't work backwards. If we're trying to prove causation, we can't say, well, he passed out, so he must have been exposed to this amount, and this amount caused him to pass out, right? It can't work circular like that. So there's some cases where it's impossible to do that, but again, we don't even have to get to that question ever because Havner is completely inapplicable. If you don't have any more questions, I will . . . Okay. Mr. Jones, we appreciate it. Do you have something else, Judge Duncan? Okay. We'll see you back on rebuttal. All right. Mr. Stanfield, whenever you're ready. Thank you, Your Honor. May it please the Court. I actually want to start with something that Mr. Jones said at the very end of his argument, and it's something we agree with completely. It is not permissible. You cannot work backwards to say that because something happened, there must have been an exposure at a certain level in order to prove medical causation, but that is exactly what Plaintiff is trying to do here. His own expert, Dr. Snyder, admitted that you can smell H2S at .13 parts per million, but as he went on to say, you would have to have an exposure of at least several minutes to between 700 and 1,000 parts per million of H2S in order to become unconscious. So the only way that they try to prove medical causation is actually trying to work backwards, relying on temporality alone, which is not permitted under Texas law. Instead, it is foundational under Texas law that you have to have direct, reliable, scientific medical causation evidence for general and specific causation. Havner provided an exception to that requirement for direct, scientifically reliable evidence for a toxic exposure case, but here Plaintiff doesn't want to meet either of those standards. Instead, Plaintiff wants to meet a rarely applied and very narrow exception to say that when a lay person can adequately, based upon general experience, evaluate both the occurrence and the alleged health effects from that occurrence, when a plaintiff enters a situation with no confounding prior medical conditions, and when there is an immediate health effect that is immediately treated, then you can rely only on lay testimony. But that does not work here at all. I thought they were arguing that that, I might have misunderstood, that that constitutes direct evidence. I don't know if they're arguing that or not. Are they, in your view, are they You have to meet Havner? Your Honor, yes. My understanding is that they are reading the Morgan decision, which has been limited to its specific facts by the Supreme Court of Texas and the Guevara decision, that they are reading Morgan to establish that you can rely on lay evidence only when there is this strong, logically traceable series of events that leads to a specific injury. But as the Guevara decision stated, you can only apply that exception to the requirement for medical scientific testimony if you've got both an occurrence here, an alleged exposure, and a health effect, here the alleged knockdown effect or headaches or something else, that are within the common understanding of a lay person, one. But two, also important, what Guevara said, and what this Court also applied in the Johnson decision and was true in the Morgan case, the plaintiff has to enter that situation without confounding prior medical history that would otherwise explain what occurred. So as Guevara talked about, if a person enters a car and does not have a broken leg, has a car accident and leaves the car with a broken leg, well, we all have a common understanding and experience that a car accident can cause a broken leg, and that when we have a healthy plaintiff without a broken leg who leaves an accident with a broken leg, that accident probably caused the broken leg. In Morgan, it was a default judgment case. There, the evidence was, as quoted in Guevara as well, is that there was a plaintiff who was healthy and had no prior medical history. Same thing in Johnson. We have a plaintiff who had no prior medical history, was in good health. That is not the case here whatsoever, which leads us directly back into Habner, setting aside the epidemiological studies. It is a foundational principle of Texas causation law that you must exclude alternate causes to a reasonable degree of medical certainty when there are other potential causes. And Dr. Snyder, plaintiff's own expert, testified without prompting that you could have a situation where you would have the exact effect that we had with Mr. Newsom, with a blood pressure drop, with stress, fatigue, other physical abnormalities, as he said. And when you look at Mr. Newsom's medical history as is laid out in Dr. Maisel's report, we see exactly that. We have morbid obesity, there's hypertension, he has a history of migraines, sleep apnea, fatigue. And so a lay person might say, well, if there's an exposure to a chemical, like in Morgan, maybe you'd have blurry eyes or difficulty breathing. You can't get past the other requirement as laid out in Guevara, which states, okay, but Mr. Newsom needed to enter this situation without prior medical history that would otherwise explain the event. Once we get into prior medical history, it must be dealt with to a reasonable degree of medical certainty. And then we have the issue that these are not acute injuries. And again, it is important to note, at most we're talking about something acute. Finally, Your Honor, while we don't think you need to necessarily reach the issue, if the panel were to determine that there were some fact issue to go back on a medical side, as we put in our briefing, we do believe that you can also affirm the judgment below by reaching one of our other arguments raised, which is that there was no evidence that international papers negligence was the cause of any alleged H2S release. Well, didn't your expert, John Kind, concede general causation? No, Your Honor. I want to be very clear about this, and I appreciate the way that you put the question. So when we talk about general causation on the medical testimony, what Dr. Havner did was take various case reports and state that, yes, there are case reports out there where individuals have been exposed to hydrogen sulfide H2S, again, at very elevated levels for a duration and were rendered unconscious. What he did not do, and this is an important distinction under Havner, what he did not do is state that there were specific studies that established that with a 95% confidence rating, if you, an individual, are exposed to a specific dose for a specific duration, it is more likely than not, it is probable that you will be rendered unconscious. He did not reach that general causation opinion. But in any event, we have a substance that can be smelled at 0.13 parts per million. The alarms that are talked about in the record, the H2S monitors, as Dr. Kind talks about, they are set to alarm at 5 parts per million. But all of the experts agree that to have consciousness, you would have to be exposed to much closer to 1,000 parts per million and for several minutes. And Dr. Snyder testifies to that. He testifies that when he talks about instantaneous exposure, he's talking about exposure for several minutes. And that is not something that the record bears out here. So what is your, what's your best authority for the argument that Dr. Kind's opinions do not establish general causation? Well, Your Honor, I would just look at what this court has said in terms of not relying on material safety data sheets, NIOSH, ASTDR, et cetera. Those are the types of things that Dr. Kind was citing to. This is not a situation like the Bostic decision, where there was an international paper, it was Georgia Pacific, did concede, as I think they had to, that asbestos can, and that there are sufficient studies that it can cause mesothelioma. So I would just say that Dr. Kind did not set out to, and he did not state a general causation opinion. He cited the case reports and stated that it could happen. But again, it's not dispositive here because there is no evidence, and plaintiff concedes there's no evidence of any particular concentration or duration of exposure to that concentration in this case. So if there are further questions, I'd be happy to answer them. Otherwise, I yield back. Okay. Thank you, Your Honors. Appreciate it. Thank you. All right. So first off, Johnson and Morgan are good law. And in fact, Guevara, in the Guevara case, the Texas Supreme Court was asked to overrule Morgan. It was given a chance and said, hey, this doesn't comply with Havner. You've done Havner now, and so Morgan needs to be overruled. And the court said, no, this is still a logical sequence in which the jury can infer causation from the sequence. So Morgan is definitely the guiding authority as far as Texas is concerned. Johnson, another Fifth Circuit case which is excellent, there's nothing in any of those cases that says that the person has to immediately be treated. Although Mr. Newsom was immediately treated, there's nothing that says that he has to be. Now in Johnson, there was immediate treatment. He went to the ER. In Morgan, she did not. The whole month went by where she's dealing with these symptoms before she received any treatment that we know of. The alternative causes, I think those are proper jury arguments. They should be able to argue that it was a blood pressure drop, not the toxic chemical that's known to do exactly what it did. They should be able to argue that. The problem with that is there's no history of any feigning spells. This is a man who's passed his DOT physical. Every year, he's driving and operating a truck in accordance with that. He has no history like that. High blood pressure? Okay. That's probably a lot of us. And that doesn't mean that he just faints and passes out every time he bends over. There's no history that that ever happened. Again, good jury argument. Definitely not a dispositive fact that should dismiss the case. Does Havner apply to all chemical exposure toxictory cases? I'm glad you asked that question, and I hope y'all clarify that no, it does not. Because the threshold question for Havner is, is there direct proof of causation? And if not, now here's the formula you can follow. And we know that because there's a Texas case in which they applied Havner to an accident reconstructionist's opinions. So it had nothing to do with the toxic exposure. So that's exactly right. The threshold question is, is there direct proof? If so, we don't have to look at Havner. And you might have direct proof for some injuries and not for others. And so Havner may apply to some and not others. For example, if Mr. Newsom is diagnosed, God forbid, with a horrible cancer or something like that, and we try to trace it back to this exposure. At that point, absolutely, we would have to have Havner to show that, to prove the general causation that that type of cancer, that he's at a much higher risk for that in compliance with Havner. The expert, IP's expert, Dr. Kine absolutely conceded general causation. And keep in mind too, Havner is, that's what it's all about, is general causation. So if general causation is satisfied, we don't have to look at Havner anymore. So it's satisfied because there's direct proof, and then it's satisfied because Dr. Kine has admitted that it's general causation. And he doesn't, he does not say, hey, in some cases, this is what's happened. No, he adopts this and states everything as matter of fact. Within 500 to 700 parts per million, it can kill you with a few breaths. There's also evidence, before your honors, that shows that the H2S alarms that go off at five parts per million, that one of the employees said it fried, it fried the alarm because there was so much of it. So they come back to the scene, and this is after Mr. Newsom has already regained consciousness. Now they're coming to investigate with the H2S monitors finally, and it fries one of them. So there's a litany of evidence, overwhelming evidence that supports that. I did want to touch on the expert designation. Again, Dr. Haynes is going to save a tremendous amount of time. He's a summary expert that's going to look at those reports, but also he's educated on some of this toxicology issues. The court has repeatedly said that a continuance is the appropriate remedy for this, and not just barring the plaintiff from being able to present their case or any party. None of us can be perfect. None of us think of all the arguments that are going to come up, but in this case, we did not even have a trial date. So when the motion was filed, we were on a two-month docket. When the order was rendered, we were four or five months past the expiration of that docket. If there's no further questions, thank you. Jones, we appreciate it. Thanks to counsel for both sides. I think that wraps up our docket for the week. So we went out on a high note. Thank you both, and safe travels back home. And the court will stand adjourned.